UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| 3207 WASHINGTON ROAD, LLC, JANE DOE 1, JANE DOE 2, KEEP IT SIMPLE HOUSE ATLANTA, LLC, BENJAMIN CARTER, and RANDALL EVANS, | CIVIL ACTION |
| Plaintiffs. | FILE NO. 1:18-CV-02975-SCJ |
| v. | |
| CITY OF EAST POINT, GEORGIA, | |
| Defendant. | |

## FIRST AMENDED COMPLAINT

Plaintiffs, 3207 Washington Road, LLC, Jane Doe 1, Jane Doe 2, Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans file this First Amended Complaint against Defendant, the City of East Point, Georgia, showing the Court as follows:

## I. Introduction

1.      This is a suit for housing discrimination against persons with disabilities in violation of federal law.

2.     Plaintiff 3207 Washington Road, LLC (the "Property Owner") owns apartment dwellings located at 3207 Washington Road in the City of East Point (the "Subject Property"), where it provides group housing for disabled persons recovering from substance use disorder. Jane Doe 1 and Jane Doe 2 are two of the Subject Property's residents.[1]

3.     Even though this group home is a residential apartment dwelling allowed under the property's zoning classification, the City has interfered with its operation by citing the operator and two employees for alleged zoning violations and for operating without a business license or a certificate of occupancy.

4.     The City's ordinance and the citations issued by the City all rest on the same premise: that an apartment dwelling housing those who are seeking or have sought treatment for substance use disorder is a different use—requiring different approvals and a different zoning classification—than apartment dwellings housing nondisabled persons.

5.     After the original Plaintiffs filed the original Complaint in this action, the City threatened to issue additional code-enforcement citations to Plaintiffs Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans, and the

---

[1] Jane Doe 1 and Jane Doe 2, two residents of the Subject Property who are in recovery from substance use disorder, will file a separate motion to proceed anonymously in this case under *Doe v. Frank,* 951 F.2d 320 (11th Cir. 1992), and related precedent.

City further threatened to take "administrative" action to "close down" the group home at the Subject Property.

6. Singling out this group home and its residents for different treatment violates the federal Fair Housing Act, the Americans With Disabilities Act, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Threatening interference and retaliation against Plaintiffs Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans also violates the federal Fair Housing Act. Plaintiffs seek temporary and permanent injunctive relief, damages, and attorneys' fees to remedy those violations.

## II. Parties, Jurisdiction, and Venue

7. 3207 Washington Road, LLC is a Georgia limited liability company in good standing with the Georgia Secretary of State.

8. Jane Doe 1 is an individual resident and domiciliary of the Northern District of Georgia.

9. Jane Doe 2 is an individual resident and domiciliary of the Northern District of Georgia.

10. Keep It Simple House Atlanta, LLC is a Georgia limited liability company in good standing with the Georgia Secretary of State.

11.     Benjamin Carter is an individual resident and domiciliary of the Northern District of Georgia.

12.     Randall Evans is an individual resident and domiciliary of the Northern District of Georgia.

13.     The City of East Point is a Georgia municipal corporation and is subject to the jurisdiction of this Court.

14.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question).

15.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and 28 U.S.C. § 90(a)(2) because the City is here, the Subject Property is here, and the events and omissions giving rise to this action occurred here.

### III. Federal Fair-Housing Laws

16.     "[H]istorically, society has tended to isolate and segregate individuals with disabilities"—in particular through discriminatory housing policies and practices. 42 U.S.C. §§ 12101(a)(2) and (3).

17.     To address this, Congress amended the federal Fair Housing Act (the "FHA") in 1988 to extend its protections to persons with handicaps.

18.     The 1988 amendments to the FHA were "a clear pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps

from the American mainstream." H.R. Rep. No. 711, 100th Cong., 2d Sess. 18, *reprinted in* 1988 U.S.C.C.A.N. 2173, 2179.

19.    The FHA makes it illegal "[t]o discriminate in the sale or rental, or to otherwise make unavailable or to deny, a dwelling to any buyer or renter because of a handicap" of "that buyer or renter," or "a person residing in or intending to reside in that dwelling after it is sold, rented, or made available," or "any person associated with that buyer or renter." 42 U.S.C. § 3604(f)(1).

20.    The FHA also makes it illegal "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap" of "that person," or "a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available," or "any person associated with that person." 42 U.S.C. § 3604(f)(2).

21.    Prohibited discrimination under the FHA includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a disabled person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

22.     Similarly, in the Americans With Disabilities Act (the "ADA"), Congress issued "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

23.     The ADA's declared goals include assuring "equality of opportunity, full participation, independent living, and economic self-sufficiency" for people with disabilities. 42 U.S.C. § 12101(a)(7).

24.     To that end, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

### IV. "Handicap" and "Disability"

25.     Under the FHA, "handicap" means "a physical or mental impairment which substantially limits one or more of such person's major life activities," or "a record of having such an impairment," or "being regarded as having such an impairment …." 42 U.S.C. § 3602(h).

26.     Similarly, under the ADA, the term "disability" means "a physical or mental impairment that substantially limits one or more major life activities," or "a record of such an impairment," or "being regarded as having such an impairment …." 42 U.S.C. § 12102(1).

27.     Alcoholism and drug addiction are recognized as "physical or mental impairments" within the meaning of the FHA and the ADA. 24 C.F.R. § 110.201.

28.     People who are in recovery from alcohol and drug addiction are recognized as "handicapped" and "disabled" within the meaning of the FHA and the ADA.

29.     As Congress recognized, depriving those in recovery from drug addiction of fair housing "would constitute irrational discrimination that may seriously jeopardize their continued recovery." H.R. Rep. 771, 100th Cong., 2d Sess. 22 (1988), ¶ 3.

## V. Applicability to Local Governments

30.     Congress recognized and intended to address the role state and local governments play in housing discrimination: "While state and local governments have authority to protect safety and health, and to regulate use of land, that authority has sometimes been used to restrict the ability of individuals with handicaps to live in communities." H.R. Rep. No. 100–711, 100th Cong., 2d Sess. 24, *reprinted in* 1988 U.S.C.C.A.N. at 2173, 2185.

31.     Thus, "the prohibitions [in the FHA] against discrimination against those with handicaps apply to zoning decisions and practices. The [FHA] is intended to prohibit the application of special requirements through land-use

regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community." H.R. Rep. No. 100–711, 100th Cong., 2d Sess. 24, *reprinted in* 1988 U.S.C.C.A.N. at 2173, 2185.

32.     Federal regulations implementing the FHA specifically prohibit, as a discriminatory activity, providing municipal services differently because of handicap. 24 C.F.R. § 100.70(d)(4).

33.     Title II of the ADA also applies to local governments. 42 U.S.C. § 12131(1)(A). In particular, a local government's adoption, application, and enforcement of its zoning and land-use laws constitutes a public "program" or "service" within the meaning of 42 U.S.C. § 12132.

34.     Thus, under the FHA and the ADA, local governments cannot apply zoning and land-use regulations in a manner that gives persons with handicaps or disabilities less opportunity to live in certain neighborhoods than people without handicaps or disabilities.

## VI. FHA and ADA Standing, Claims, and Remedies

35.     Under the FHA, any "aggrieved person" may commence a civil action in an appropriate United States district court … to obtain appropriate relief" for a discriminatory housing practice. 42 U.S.C. § 3613(a)(1)(A).

36.     For purposes of the FHA, an "aggrieved person" includes any person who "claims to have been injured by a discriminatory housing practice" or who "believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. § 3602(i).

37      Title II of the ADA gives standing to "any person alleging discrimination on the basis of disability …." 42 U.S.C. § 12133.

38.     Those with standing to bring claims under the FHA and the ADA include people with disabilities or handicaps as well as those who seek to provide housing or other services to people with disabilities or handicaps.

39.     Jane Doe 1 a person with a handicap within the meaning of the FHA, is a person with a disability within the meaning of the ADA, and has standing to bring the claims in this action.

40.     Jane Doe 2 a person with a handicap within the meaning of the FHA, is a person with a disability within the meaning of the ADA, and has standing to bring the claims in this action.

41.     The Property Owner provides housing to persons with handicaps and disabilities within the meaning of the FHA and the ADA and has standing to bring the claims in this action.

42.     Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans provide and assist in providing housing and other services to persons with handicaps within the meaning of the FHA and have standing to bring the claims in this action.

43.     Five kinds of FHA and ADA claims are relevant to this case.

44.     One kind of FHA and ADA claim is for intentional discrimination (or disparate treatment) where a local ordinance or policy discriminates against people with handicaps or disabilities on its face.

45.     A second kind of FHA and ADA claim is for intentional discrimination (or disparate treatment) in the application of otherwise neutral ordinances and policies.

46.     A third kind of FHA and ADA claim is for disparate impact, where an otherwise neutral ordinance or policy has a differential impact on persons with handicaps or disabilities.

47.     A fourth kind of FHA and ADA claim is for failure to make a reasonable accommodation needed to afford a disabled person an equal opportunity to use and enjoy a dwelling.

48.     A fifth kind of FHA claim is for coercion, intimidation, threats, or interference. The FHA makes it illegal "to coerce, intimidate, threaten or interfere

with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected" in the FHA. 42 U.S.C. § 3617.

49.     Plaintiffs are aggrieved persons within the meaning of the FHA and the ADA.

## VII. Group Homes

50.     Group homes are a common and important way to enable persons with handicaps and disabilities to live in residential communities they otherwise might not be able to enjoy.

51.     Group homes play an especially important role in the process of recovery from substance use disorder.

52.     Lack of a stable, alcohol- and drug-free living environment can be a serious obstacle to recovery.

53.     For those coming from in-patient rehabilitation programs, group recovery homes provide that stable, sober environment, offering peer support, solidarity, supervision, and accountability to guard against relapse.

54.     At the same time, they allow residents to build and grow into increased levels of autonomy and responsibility that, in time, will lead them to fully independent living.

55.     Congress recognized the role state and local governments often play in adopting regulations that "discriminat[e] against group-housing arrangements among non-related persons with disabilities." H.R. Rep. No. 100–711, 100th Cong., 2d Sess. 24, *reprinted in* 1988 U.S.C.C.A.N. at 2173, 2185.

56.     Since such state and local requirements "are not imposed on families and groups of similar size of other unrelated people," Congress found that they "have the effect of discriminating against persons with disabilities." H.R. Rep. No. 100–711, 100th Cong., 2d Sess. 24, *reprinted in* 1988 U.S.C.C.A.N. at 2173, 2185.

57.     The Department of Justice and the Department of Housing and Urban Development have also recognized the protection afforded to group homes under the FHA, stating that people with disabilities have the same rights and protections "whether or not their housing is considered a group home." Joint Statement of the Department of Housing and Urban Development and the Department of Justice Regarding State and Local Land Use Laws and Practices and the Application of the Fair Housing Act, issued November 10, 2016 (the "HUD and DOJ Joint Statement"), at 7, 8.)

58. "A household where two or more persons with disabilities choose to live together, as a matter of association, may not be subjected to requirements or conditions that are not imposed on households consisting of persons without disabilities." HUD and DOJ Joint Statement at 7

59. Protected group homes specifically include "homes occupied by persons in recovery from alcohol or substance abuse, who are persons with disabilities under the [Fair Housing] Act." HUD and DOJ Joint Statement at 7.

60. A local government may violate federal fair-housing protections by banning group homes in certain areas, by prohibiting group homes for persons with certain kinds of disabilities, or by refusing to grant reasonable accommodations to zoning or land-use policies that may be necessary to allow persons with disabilities an equal opportunity to use and enjoy a dwelling. HUD and DOJ Joint Statement at 8, 12.

**VIII. The Group Recovery Home at the Subject Property**

61. The Property Owner was formed in 2017 to acquire the Subject Property.

62. The Subject Property is zoned R-3 (Multifamily Development District) under the City's zoning ordinance, a district that allows multifamily apartment dwellings.

13

63.     The Subject Property contains four residential apartment buildings built in the 1960s and was being used as residential apartments when the Property Owner acquired it in 2017.

64.     Since acquiring the Subject Property, the Property Owner has continued the Subject Property's residential use, but as a group recovery home for those recovering from substance use disorder, called Keep It Simple House Atlanta.

65.     The Property Owner continues to lease the Subject Property's apartment units for use as residential dwellings.

66.     The Property Owner also provides additional elements of structure and support to enable those in the early stages of recovery from substance use disorder the opportunity to enjoy these apartment dwellings, but provides no licensable treatment services on site.

67.     Residents are required to remain drug and alcohol free and are required to attend twelve-step group meetings.

68.     Staff living at the Subject Property ensure that these rules are followed and provide support for residents.

69.     Residents also meet with a life coach who can help them with things like building a résumé and formulating a plan for finding work.

70.     Residents commit to a three-month stay. Most stay from three to six months or longer, and residents may stay as long as they feel they need the support and structure that group living provides.

71.     Jane Doe 1 is recovering from substance use disorder and has lived at the Subject Property for six months.

72.     Jane Doe 2 is recovering from substance use disorder and has lived at the Subject Property for four months.

73.     The Subject Property's group home is certified by the Georgia Association of Recovery Residences.

74.     On or about March 5, 2018, the Property Owner obtained Business Occupational Tax Certificate No. 18-00016077 from the City of East Point Department of Planning and Zoning for "apartment housing" at the Subject Property (the "Business License").

75.     On or about March 1, 2018, the Property Owner obtained Certificate of Occupancy No. 08-0136 from the City of East Point Department of Planning and Community Development for "R-3" (multifamily residential) use, with four persons per unit, at the Subject Property (the "Certificate of Occupancy").

## IX. The Subject Property Is a "Dwelling"

76.     City Code § 10–2003 defines a "dwelling" as "[a]ny building or portion thereof which is designed for or used for residential purposes for periods of more than 30 consecutive days."

77.     City Code § 10–2003 defines "dwelling unit" as "[o]ne or more rooms constructed with cooking, sleeping and sanitary facilities designed for and limited to use as living quarters."

78.     City Code § 10–2003 defines "apartment" as "[a] building which contains three or more dwelling units either attached to the side, above or below another unit."

79.     The Subject Property is developed and is being used as a "dwelling" within the meaning of the City of East Point's City Code.

80.     The FHA defines a "dwelling" to include "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families …." 42 U.S.C. § 3602(b).

81.     A "family" under the FHA includes "a single individual." 42 U.S.C. § 3602(c).

82.     The Subject Property is developed and currently used as a "dwelling" within the meaning of the FHA.

## X. The Subject Property is Not a
## Hospital, Clinic, or Rehabilitation Center

83.     City Code § 10–2003 defines a "hospital" use as "[t]he provision of in-patient health care for people, including general medical and surgical services, psychiatric care and specialty medical facilities." "Out-patient facilities," it continues, "are normally included."

84.     City Code § 10–2003 defines a "clinic" as "[a] use where medical examination and treatment is administered to persons on an outpatient basis," continuing that "[n]o patient shall be lodged on an overnight basis."

85.     City Code § 10–2003 contains a separate definition for "rehabilitation center," which "[s]hall include rehabilitation centers for persons with alcohol, drug abuse or other dependency problems or mentally or physically handicapped persons."

86.     The distinction in the City Code between "hospitals," "clinics," and "rehabilitation centers," on the one hand, and "dwellings," on the other hand, is based on a property's use, not the identity of its occupants.

87.     An inpatient treatment facility is a "hospital" not because its residents are sick, but because it provides "in-patient health care" at the property.

88.     An outpatient treatment facility is a "hospital" or a "clinic" not because its visitors are sick, but because of the "provision of … health care" and the "treatment … administered" on site.

89.     A rehabilitation center is a "rehabilitation center" not because its residents or visitors have dependency problems or mental or physical handicaps, but because it provides treatment for those conditions at the property.

90.     Likewise, a dwelling is a "dwelling" not because of who its occupants are but how they use the property—"for residential purposes," as "living quarters."

91.     A separate entity, East Point Recovery Center, LLC, is planning to provide outpatient treatment for persons recovering from substance use disorder on a separate, separately owned, and separately zoned property in the City of East Point adjacent to the Subject Property.

92.     The Property Owner does not own the separate property where East Point Recovery Center, LLC plans to provide outpatient treatment.

93.     Neither the Property Owner nor Keep It Simple House Atlanta, LLC provides any licensable treatment at the Subject Property. All the Property Owner and Keep It Simple House Atlanta, LLC provide at the Subject Property is a sober living environment.

94.     Some of the Subject Property's residents may also seek treatment at an outpatient facility, including the one that East Point Recovery Center, LLC plans to operate nearby.

95.     But none of the participants in East Point Recovery Center, LLC's outpatient treatment program will be required to live at the Subject Property.

96.     None of the Subject Property's residents are or will be required to receive inpatient or outpatient treatment. Residents at the Subject Property need only commit to sober living.

97.     The group home at the Subject Property is not a "hospital," a "clinic," or a "rehabilitation center" within the meaning of the City's ordinance. It is simply an apartment dwelling allowed in the R-3 zoning district.

**XI. Citations Issued by the City of East Point**

98.     On April 6 and April 10, 2018, the City of East Point issued nine citations to Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans.

99.     Three of the nine citations accuse Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans of operating without a business license in violation of City Code § 5–2023.

100. Three of the nine citations accuse Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans of not having a certificate of occupancy in violation of City Code § 10–3007.

101. Three of the nine citations accuse Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans of violations of zoning, citing City Code § 10–2065.

102. All nine citations allege that the Subject Property is "housing rehabilitation patients," and all nine rest on the same premise: that "housing rehabilitation patients" is a different use than housing other citizens, requiring different licenses, certificates, and zoning approvals.

103. The three citations accusing the three defendants of violations of zoning cite City Code § 10–2065, which sets forth the use regulations for the R-3 zoning classification.

104. City Code § 10–2065(a)(3) expressly allows land and structures in the R-3 district to be used for a "Multi-family dwelling."

105. The Subject Property contains four apartment buildings built in the 1960s and was being used as residential apartments in 2017.

106.   Since buying the Subject Property, the Property Owner has continued to use the Subject Property for apartment dwellings within the meaning of the City Code.

107.   In March, the City issued the Business License and the Certificate of Occupancy to the Property Owner contemplating the Subject Property's use for apartment dwellings as allowed in the R-3 zoning district.

108.   The City's citations issued in April are not based on the use of the Subject Property for "housing," as expressly allowed under the R-3 district's use regulations. Rather, those three citations accuse Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans of "housing rehabilitation patients."

109.   The three citations issued for alleged zoning violations distinguish between apartment dwellings housing people recovering from substance use disorder and apartment dwellings housing other citizens, treating the former as a different use that is not allowed in the R-3 zoning district.

110.   The same interpretation underlies the citations for not having a certificate of occupancy.

111.   City Code § 10–3007 ("Certificate of occupancy") requires one who wishes "to change the use of a building or structure" to obtain a certificate of occupancy.

112.    But the Property Owner obtained its Certificate of Occupancy from the City in March 2018, for "R-3" residential occupancy—that is, residential occupancy consistent with the Subject Property's R-3 zoning classification—with four occupants per unit.

113.    The City's citations issued in April do not accuse Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans of not having a certificate of occupancy for the Subject Property at all.

114.    Rather, those three citations accuse those three defendants of having changed the use of the buildings at the Subject Property from R-3 residential, with four occupants per unit, to some other use—namely, "housing rehabilitation patients"—without obtaining a new certificate of occupancy for that new use.

115.    Thus, the three citations issued for not having a certificate of occupancy distinguish between R-3 residential uses for people recovering from substance use disorder and R-3 residential uses for other citizens, imposing additional requirements on the former that are not imposed on the latter.

116.    Similarly, City Code § 5–2023 ("Business license required before entering into business") requires anyone doing any taxable business to pay business taxes to the City before beginning business.

117. But the Property Owner obtained its Business License from the City on March 5, 2018, for "apartment housing."

118. The City's citations issued in April do not accuse Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans of not having a license for *any* business at the Subject Property.

119. Rather, those three citations accuse those three defendants of conducting another business at the property besides the "apartment housing" business covered by the Business License issued in March—namely, "housing rehabilitation patients"—without obtaining a separate license for that other business.

120. Thus, the three citations issued for not having a business license distinguish between "apartment housing" for people recovering from substance use disorder and "apartment housing" for other citizens, imposing additional requirements on the former that are not imposed on the latter.

121. The City's citations ignored the plain meaning of the City's code and constitute an arbitrary, convoluted interpretation of the City's code that resulted from an intent to discriminate.

## XII. Requests for Reasonable Accommodations

122.   On April 12, 2018, an attorney representing the Property Owner sent an email to the City Attorney and the City code-enforcement officer who issued the citations.

123.   The Property Owner's attorney's April 12, 2018, email described the FHA's and ADA's obligations on local governments, including the duty to make reasonable accommodations by modifying zoning policies, practices, and procedures when such modifications are necessary to avoid discrimination on the basis of disability.

124.   The Property Owner's attorney's April 12, 2018, email explained that the Subject Property's residents are entitled to the protections of the FHA and ADA and requested reasonable accommodations to allow the residents of the Subject Property to continue to live there.

125.   The City made no accommodation in response to the Property Owner's attorney's April 12, 2018, email, and has constructively denied the requested accommodation.

126.   On May 2, 2018, the Property Owner's attorney filed a motion to dismiss the nine citations against Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans, again describing the requirements of the FHA and the

ADA and describing the reasonable accommodations required to allow the residents to continue to live at the Subject Property.

127.  On May 3, 2018, the Property Owner's attorney served a copy of the motion to dismiss on the City attorney and the City solicitor assigned to the municipal-court case involving the nine citations against Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans.

128.  In the Property Owner's attorney's May 3, 2018, cover letter to the City attorney and the City solicitor, the Property Owner's attorney made yet another request to the City to make the reasonable accommodation required by law by dismissing the nine pending citations and allowing the Property Owner to house residents at the Subject Property just as any other owner of any other R-3-zoned property, without regard to the residents' disabilities.

129.  The City made no accommodation in response to this request, either. In fact, the City ignored it altogether, and by ignoring it, the City has constructively denied the requested accommodation.

## XIII. Further Threats and Intimidation After the Filing of the Original Complaint

130.  The Property Owner, Jane Doe 1, and Jane Doe 2 filed the original Complaint in this case on Tuesday, June 19, 2018. That same afternoon, Plaintiffs' counsel sent a courtesy copy of the Complaint by email to the City Attorney and to

the City Solicitor prosecuting the code-enforcement citations in East Point Municipal Court against Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans.

131.   The next morning, Wednesday, June 20, 2018, the citations against Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans came on for hearing in East Point Municipal Court.

132.   Before the citations came on for hearing, the City Solicitor and a City code-enforcement officer told Plaintiffs' counsel they intended to issue new citations there, that morning, to Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans for alleged building-code violations.

133.   The City Solicitor also told Plaintiffs' counsel that the City was going to pursue an "administrative warrant to close them down." The City Solicitor said he did not know who in the City government Keep It Simple House Atlanta, LLC should speak with about this threatened action.

134.   In another meeting a few minutes later, the City Solicitor said the City would not be issuing new citations to Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans there at the courthouse that morning.

135.   Plaintiffs' counsel asked the City Solicitor whether that meant the City also would not be pursuing the "administrative warrant to close them down,"

and the City Solicitor said that decision had not been made yet. Plaintiffs' counsel asked if the City would provide notice when the decision was made, and the City Solicitor said no. Plaintiffs' counsel asked if the City would provide notice if the City did decide to take action to "close down" the group home, and the City Solicitor again said no, no advance notice would be given.

## XIV. Damages and Irreparable Harm

136. The City's conduct has caused and continues to threaten injury and damage to the Property Owner including, without limitation, attorney's fees and expenses, threatened economic injury if the Subject Property cannot be used for its intended purpose as a group recovery home, and the loss of the investment already made in the Subject Property and repairs and remodeling at the Subject Property.

137. Jane Doe 1, Jane Doe 2, and the other residents at the Subject Property will suffer irreparable harm from the City's conduct. "Discrimination in housing, when proved, almost always results in irreparable injury." *Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1424 (11th Cir. 1984). "[A] person who is discriminated against in the search for housing cannot remain in limbo while a court resolves the matter. He or she must find housing elsewhere, and once that housing is found, even if in a segregated neighborhood, it becomes difficult to disrupt new friendships and other community ties by uprooting oneself again." *Id.*

138. The City's conduct and the loss of group housing also jeopardizes the continued recovery of Jane Doe 1, Jane Doe 2, and the other residents at the Subject Property. Without supervision and peer support, they could suffer relapse, which threatens not only a potentially irremediable reversion to chronic substance abuse, but even physical harm or death.

## XV. Causes of Action

## Count One

## Disparate Treatment—Facially Invalid Ordinance

139. Plaintiffs repeat and made a part hereof, as if fully set forth herein, the foregoing allegations in paragraphs 1-121 and 136-138 of this First Amended Complaint. The Property Owner, Jane Doe 1, and Jane Doe 2 assert this Count One against the City.

140. In a facial challenge, whether the drafters' motives are benign or evil is irrelevant. All that matters is whether the ordinance imposes rules or conditions on persons with handicaps or disabilities that it does not impose on others.

141. Even additional procedural requirements, standing alone, are unlawful if they are imposed in a discriminatory manner.

142. The City's ordinance discriminates on its face against people with handicaps and disabilities by largely banning them from the City's residential

communities and isolating and segregating them in a few non-residential zoning districts.

143. City Code § 10–2003 defines "rehabilitation center" to include "rehabilitation centers for persons with alcohol, drug abuse or other dependency problems or mentally or physically handicapped persons."

144. The ordinance does not allow "rehabilitation centers" in any of the City's residential zoning districts. They are permitted uses only in the E-I (Educational Institutional) and M-I (Medical Institutional) zoning districts, and then only after obtaining a use permit. City Code §§ 10-2070, 10-2071.

145. City Code § 10-2003 defines "community living arrangement" as "[a] residence, whether operated for profit or not, that undertakes through its ownership or management to provide or arrange for the provision of daily personal services, support, care, or treatment exclusively for two or more adults who are not related to the owner or administrator by blood or marriage and whose residential services are financially supported, in whole or in part, by funds designated through the Department of Human Resources, Division of Mental Health, Developmental Disabilities, and Addictive Diseases."

146. The ordinance does not allow "community living arrangements" in any of the City's residential zoning districts. They are permitted uses only in the E-

I (Educational Institutional), M-I (Medical Institutional), and MIX (Mixed Use) zoning districts, and then only after obtaining a use permit. City Code §§ 10-2070, 10-2071, 10-2076.

147.   City Code § 10-2003 defines "adult day center" as a "facility serving aging adults that provides adult day care or adult day health services for compensation to three or more persons…. Aging adults are persons 60 years of age or older or mature adults below the age of 60 whose needs and interests are substantially similar to persons 60 years of age or older who have physical or mental limitations that restrict their abilities to perform the normal activities of daily living and impede independent living."

148.   The ordinance does not allow "adult day centers" in any of the City's residential zoning districts. They are permitted uses only in the E-I (Educational Institutional), M-I (Medical Institutional), C-2 (Central Business Commercial), and MIX (Mixed Use) zoning districts, and in three of those four districts only after obtaining a use permit. City Code §§ 10-2070, 10-2071, 10-2073, 10-2076.

149.   City Code § 10-2003 defines "personal care home" to mean "any dwelling whether operated for profit or not, which undertakes through its ownership or management to provide or arrange for the provision of housing, food

service, and one or more personal services for two or more adults who are not related to the owner or administrator by blood or marriage."

150. The ordinance does not allow "personal care homes" in any of the City's residential zoning districts. They are permitted uses only in the E-I (Educational Institutional), M-I (Medical Institutional), and MIX (Mixed Use) zoning districts, and then only after obtaining a use permit. City Code §§ 10-2070, 10-2071, 10-2076.

151. The City's ordinance codifies the very isolation and segregation of people with disabilities that Congress identified and intended to remedy more than 25 years ago in the FHA and ADA.

152. The City apparently contends that by operating a group apartment dwelling for persons in recovery from substance use disorder, the Property Owner is "housing rehabilitation patients" (as stated in the citations) and therefore is operating a "rehabilitation center," which under the ordinance is banned from all of the City's residential zoning districts.

153. Plaintiffs deny that the Subject Property is a "rehabilitation center" within the meaning of the City's ordinance.

154. But if merely providing group apartment housing to people in recovery from substance use disorder is considered a different use than providing

apartment housing to other citizens, then the ordinance discriminates against Jane Doe 1, Jane Doe 2, and the other residents at the Subject Property on account of their recognized handicaps and disabilities in violation of the FHA and the ADA.

**Count Two**

**Disparate Treatment—As Applied**

155.   Plaintiffs repeat and make a part hereof, as if fully set forth herein, the foregoing allegations in paragraphs 1-121 and 136-138 of this First Amended Complaint. The Property Owner, Jane Doe 1, and Jane Doe 2 assert this Count Two against the City.

156.   To show disparate treatment, a plaintiff need not show that a defendant's conduct was motivated solely, primarily, or even predominantly by a protected handicap or disability.

157.   To show disparate treatment, a plaintiff need only show that a protected handicap or disability played some role in the defendant's decision to treat a person differently.

158.   Plaintiffs do not believe the City's ordinance can be fairly read to make the Subject Property a "rehabilitation center" or anything other than an allowed apartment dwelling simply because it houses individuals recovering from substance use disorder.

159.    Therefore, under the plain language of the ordinance, Plaintiffs contend that the group recovery home at the Subject Property is a permitted apartment dwelling in the R-3 zoning district.

160.    Nevertheless, the City has issued citations and interfered with Plaintiffs' use of the Subject Property because Jane Doe 1, Jane Doe 2, and other residents at the Subject Property are recovering from substance use disorder.

161.    Therefore the City is discriminating against Plaintiffs on account of Jane Doe 1's, Jane Doe 2's, and the other residents' disabilities in violation of the FHA and the ADA.

## Count Three

## Disparate Impact

162.    Plaintiffs repeat and make a part hereof, as if fully set forth herein, the foregoing allegations in paragraphs 1-121 and 136-138 of this First Amended Complaint. The Property Owner, Jane Doe 1, and Jane Doe 2 assert this Count Three against the City.

163.    The City's zoning ordinance, even if it can be read to be neutral on its face, has a disparate impact on Jane Doe 1, Jane Doe 2, the other residents at the Subject Property, and other persons with handicaps and disabilities by excluding them from the City's residential zoning districts.

164. The City's treatment of the group recovery home at the Subject Property, even if could be construed as neutral in motive and intent, has a disparate impact on Jane Doe 1, Jane Doe 2, and the other residents at the Subject Property by excluding them from the City's residential zoning districts.

165. Therefore the City has discriminated against Jane Doe 1, Jane Doe 2, and the other residents at the Subject Property in violation of the FHA and the ADA.

**Count Four**

**Failure to Make Reasonable Accommodations**

166. Plaintiffs repeat and make a part hereof, as if fully set forth herein, the foregoing allegations in paragraphs 1-129, 136-138, 140-154, and 156-161 of this First Amended Complaint. The Property Owner, Jane Doe 1, and Jane Doe 2 assert this Count Four against the City.

167. Jane Doe 1, Jane Doe 2, and other residents of the Subject Property are handicapped within the meaning of the FHA and disabled within the meaning of the ADA.

168. The City knew or reasonably should have known of the handicapped and disabled status of the residents of the Subject Property.

169.   The Property Owner requested an accommodation that would allow Jane Doe 1, Jane Doe 2, and the other residents of the Subject Property to enjoy the use the Subject Property.

170.   The requested accommodation is necessary to afford Jane Doe 1, Jane Doe 2, and other residents of the Subject Property an equal opportunity to use and enjoy the Subject Property.

171.   The requested accommodation is reasonable.

172.   The City refused to make the accommodation.

173.   The City has failed to make reasonable accommodations as required under the FHA and the ADA and has constructively denied same.

## Count Five

### Coercion, Intimidation, Threats, and Interference

174.   Plaintiffs repeat and make a part hereof, as if fully set forth herein, the foregoing allegations in paragraphs 1-129, 136-138, 140-154, 156-161, 163-165, and 167-173 of this First Amended Complaint. The Property Owner, Jane Doe 1, and Jane Doe 2 assert this Count Five against the City.

175.   The FHA makes it illegal "to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other

person in the exercise or enjoyment of, any right granted or protected" in the FHA. 42 U.S.C. § 3617.

176.   Jane Doe 1, Jane Doe 2, and the other residents at the Subject Property have exercised and enjoyed their rights under the FHA by residing at the Subject Property.

177.   The Property Owner has aided and encouraged Jane Doe 1, Jane Doe 2, and the other residents at the Subject Property in exercising and enjoying their rights under the FHA.

178.   The City has coerced, intimidated, threatened, and interfered with Jane Doe 1, Jane Doe 2, and the other residents at the Subject Property in the exercise and enjoyment of and on account of their exercise and enjoyment of their rights under the FHA.

179.   The City has coerced, intimidated, threatened, and interfered with the Property Owner, its operator, and their employees in aiding and encouraging and on account of their having aided and encouraged others in their exercise and enjoyment of rights under the FHA.

180.   The City's acts of coercion, intimidation, threats, and interference include, without limitation, issuing citations and attempting to impose fines and other penalties against the operator and its employees.

## Count Six

## Equal Protection

181.   Plaintiffs repeat and make a part hereof, as if fully set forth herein, the foregoing allegations in paragraphs 1-129, 136-138, 140-154, 156-161, 163-165, and 167-173 of this First Amended Complaint. The Property Owner, Jane Doe 1, and Jane Doe 2 assert this Count Six against the City.

182.   The Fourteenth Amendment to the United States Constitution guarantees the equal protection of the laws.

183.   The Property Owner, Jane Doe 1, Jane Doe 2, and the other residents at the Subject Property have been deprived of their rights, privileges, and immunities secured by the Constitution and the laws of the United States, including, without limitation, the equal protection guarantee of the Fourteenth Amendment to the United States Constitution, for which 42 U.S.C. § 1983 provides a remedy.

184.   By discriminating against persons with handicaps, the City has acted arbitrarily and in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

## Count Seven

### Coercion, Intimidation, Threats, and Interference
### After the Filing of the Original Complaint

185. Plaintiffs repeat and make a part hereof, as if fully set forth herein, the foregoing allegations in paragraphs 1-138, 140-154, 156-161, 163-165, and 167-173 of this First Amended Complaint. All Plaintiffs assert this Count Seven against the City.

186. The FHA makes it illegal "to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected" in the FHA. 42 U.S.C. § 3617.

187. Jane Doe 1, Jane Doe 2, and the other residents at the Subject Property have exercised and enjoyed their rights under the FHA by residing at the Subject Property.

188. The Property Owner, Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans have aided and encouraged Jane Doe 1, Jane Doe 2, and the other residents at the Subject Property in exercising and enjoying their rights under the FHA.

189.   The City has coerced, intimidated, threatened, and interfered with Jane Doe 1, Jane Doe 2, and the other residents at the Subject Property in the exercise and enjoyment of and on account of their exercise and enjoyment of their rights under the FHA.

190.   The City has coerced, intimidated, threatened, and interfered with the Property Owner, Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans in aiding and encouraging and on account of their having aided and encouraged others in their exercise and enjoyment of rights under the FHA.

191.   The City's acts of coercion, intimidation, threats, interference, and retaliation upon which this Count Seven is based include, without limitation, the City's threat made on June 20, 2018, to issue new citations to Keep It Simple House Atlanta, LLC, Benjamin Carter, and Randall Evans and the City's threat made on June 20, 2018, to pursue "administrative" action to "close down" the group recovery home at the Subject Property.

## XVI. Relief Sought as to All Causes of Action

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)     Issue temporary and preliminary injunctions enjoining the City and all of its agents and representatives from interfering in any way with the operation of the group recovery home at the Subject Property;

(b)     Issue a permanent injunction enjoining the City and all of its agents and representatives from interfering in any way with the operation of the group recovery home at the Subject Property.

(c)     Award Plaintiffs their damages, including frustration of mission and any lost profits, caused by the City's illegal conduct;

(d)     Award Plaintiffs their litigation costs and reasonable attorneys' fees incurred in prosecuting this case; and

(e)     Grant such other and further relief in favor of Plaintiffs as may be just and proper.

Dated June 21, 2018.

/s/ Scott E. Morris
Scott E. Morris
Georgia Bar No. 004782
Ellen W. Smith
Georgia Bar No. 065778
Holt Ney Zatcoff & Wasserman, LLP
100 Galleria Parkway, Suite 1800
Atlanta, Georgia 30339
770-956-9600 (phone)
770-956-1490 (fax)
smorris@hnzw.com
esmith@hnzw.com
*Attorneys for Plaintiffs*